JOHN SAMUEL GIBSON (SBN 140647)
john.gibson@us.dlapiper.com
TANYA L. GREENE (SBN 267975)
tanya.greene@us.dlapiper.com
ERIN T. HUNTINGTON (SBN 306037)
erin.huntington@us.dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:310.595.3000
Fax:310.595.3300

Attorneys for Plaintiff,
MELTWATER NEWS US INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MELTWATER NEWS US INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>TVEYES, INC., a Delaware corporation, DOES 1 to 20<br><br>Defendants. | CASE NO. 2:24-cv-09699<br><br>**VERIFIED COMPLAINT FOR:**<br><br>**(1) BREACH OF WRITTEN CONTRACT**<br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**(3) DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Meltwater News US Inc. ("Meltwater" or "Plaintiff"), by and through the undersigned counsel, hereby files this Complaint against Defendants TVEyes, Inc. ("TVEyes") and DOES 1 to 20 (collectively hereinafter, "Defendants"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. This is an action to prevent TVEyes from irreparably damaging Meltwater's standing and reputation among its clients as part of TVEyes' attempt to manufacture leverage during the parties' renewal negotiations.

2. Meltwater is an online technology company that leverages cutting-edge data science to give its customers a complete suite of solutions across media, social,

consumer and sales platforms. As part of this comprehensive suite of solutions, Meltwater contracted with TVEyes in order to add TVEyes' broadcast monitoring capabilities to Meltwater's suite of technologies accessible to its clients.

3. Despite collaborating successfully for over a decade, resulting in over $50 million in payments from Meltwater to TVEyes, TVEyes sought even more from Meltwater. During recent renewal negotiations, following Meltwater's resistance to both TVEyes' unsupported demand for additional payments and its attempts to extract extraordinary commercial concessions, TVEyes played its ultimate card by threatening to disrupt Meltwater's business operations and harm its reputation amongst its clients.

4. TVEyes is now refusing to honor its contractual obligations to continue providing Meltwater's customers access through the end of their subscriptions in the same way it has done for years. As the parties near the end of their contractual relationship, TVEyes seeks to interpret their obligation to continue providing Meltwater customers "access" in a way that is inconsistent with how TVEyes has granted Meltwater's customers access for years and is also inconsistent with the express terms of the parties' agreement.

5. Since 2016, Meltwater's clients have been provided access to TVEyes' services ***solely*** through API integration with Meltwater's platform and not directly through TVEyes or through a separate TVEyes' portal, with the exception of very few. Access was set up this way because there is an interplay between TVEyes' content and Meltwater's larger suite of services, which permits its customers to view in one place—on Meltwater's platform—all of the aggregated data it requires. This is one reason why clients who sign up to Meltwater's suite of solutions do so in the first place, so as not to have to individually source and view the many pieces of analytics, research, and monitoring services.

6. Naturally, Meltwater contracted for "access" to be provided through API integration with Meltwater's platform, including by contracting for direct access for

its clients to "the TVE Services through the Meltwater Services."

7. For the protection of its own clients and its business model, Meltwater also contracted for that same access to its clients to continue even if and when the services agreement between Meltwater and TVEyes terminated. During this wind-down period, Meltwater even agreed to continue making payments to TVEyes for the duration of their clients' active subscriptions. As a result, TVEyes has been prepaid in connection with its obligations to continue providing Meltwater's clients access to TVEyes content solely through the Meltwater platform.

8. Now, TVEyes insists that as soon as the parties' agreement expires on November 15, 2024, it will deactivate all API integration through Meltwater—which is what permits Meltwater's clients to access TVEyes' content through Meltwater's platform—and will instead require approximately 5,000 of Meltwater clients (constituting millions of dollars in revenue to Meltwater) to log directly into TVEyes' portal in order to view TVEyes' content.

9. Thus, TVEyes' refusal to honor its obligations to continue providing Meltwater's customers with access to its broadcast monitoring services in the manner contracted for will result in business disruption to both Meltwater and its thousands of clients who receive TVEyes' services as part of a larger, comprehensive suite of services that Meltwater seamlessly provides them.

10. Meltwater advised TVEyes that its exercise of the nuclear option—impacting its clients across the globe including in the U.S., Canada, Germany, Singapore, and the U.K.—was inconsistent with the parties' contract and constituted an anticipatory repudiation thereof. But TVEyes remained unmoved, thus necessitating the instant action to preserve Meltwater's operations before TVEyes' plan can take effect on November 15, 2024.

## PARTIES

11. Plaintiff Meltwater News US Inc. is, and at all times relevant herein was, a corporation organized under the laws of the State of California, with a principal

place of business located at 555 Twin Dolphin Drive, Suite 165, Redwood City, California 94065.

12. Defendant TVEyes Inc. is, and at all times relevant herein was, a corporation organized under the laws of the State of Delaware, with a principal place of business located at 1150 Post Road, Fairfield, Connecticut 06824.

13. Meltwater does not presently know the true names and capacities of the defendants named fictitiously herein as Does 1-20; therefore, Meltwater sues these defendants by such fictitious names pursuant to Section 474 of the California Code of Civil Procedure. Meltwater will amend this Complaint to allege the true names and capacities of the fictitiously named defendants when ascertained.

14. Meltwater is informed and believes, and on that basis alleges, that at times relevant to this Complaint, each Defendant was the agent of each of the other Defendants, in that each Defendant was authorized by the other Defendants to act, and did act, as the agent of each of the other Defendants. Meltwater further alleges that Defendants undertook the actions alleged herein as agents of each other in the course and scope of their agency relationship.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over Meltwater's claims under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000 exclusive of interests and costs, and there is complete diversity of citizenship between the Parties.

16. The Court has personal jurisdiction over Defendants as provided for in Section 14.7 of the Parties' contract, and because Defendants transact business in California, maintains necessary contacts in California, and have caused harm to a resident of California through the willful breach of the Parties' contract.

17. Section 14.7 of the Agreement further provides:

*Governing law and jurisdiction*

(a) This Agreement shall be governed by and construed in accordance with California state law.

(b) Each of the parties irrevocably submits for all purposes in connection with this Agreement to the exclusive jurisdiction of the courts of California."

18. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because, *inter alia*, a substantial part of the events giving rise to the claim occurred in this District including, but not limited to, the fact that Meltwater sales of relevant TVEyes' services to its clients originated from within this District during the relevant time period, and because Defendants are subject to personal jurisdiction in this District.

## **BACKGROUND FACTS**

***Meltwater's History and Pioneering Suite of Technologies***

19. Founded in 2001 out of a shipyard in Oslo, Norway, Meltwater was one of the first online media monitoring companies in the world.

20. By harnessing the value of monitoring and analyzing online data and shaping it into curated insights for its clients, Meltwater quickly grew across Scandinavia, the UK, Europe, the US and Asia-Pacific. By 2008, Meltwater had an established presence—and a growing customer list—on every continent.

21. Today, Meltwater leverages cutting-edge data science to give its customers a complete suite of solutions across media, social, consumer and sales platforms.

22. Meltwater's diverse clientele include market leaders from around the world in a number of industries, including fashion and apparel (H&M and Puma), airline (Air France, Aeromexico), sports and entertainment (CF Montreal), food and beverage (Pernod Ricard, Kellogg's, Coca Cola), automotive (Daimler, Hyundai), healthcare (Haleon) and technology (Google, Asana).

23. Meltwater's suite of solutions offers its many clients targeted insights and analytics in multiple areas, including Media Monitoring, Media Relations, Social

Listening & Analytics, Social Media Management, Consumer Intelligence, Influencer Marketing, and Sales Intelligence.

24. Meltwater's Media Monitoring services combs through 500 million pieces of new content every day from global news sources, social media platforms, forums, blogs, print publications, and, through a partnership with TVEyes, broadcasts and podcasts so that its clients can monitor their brand, trends, markets, and the competitive landscape.

25. In order to access their customized suite of Meltwater technologies, Meltwater provides its clients with unique log-in credentials. These unique log-in credentials permit each of Meltwater's clients to access Meltwater's comprehensive suite of solutions through a secure portal available on its website. From its clients' perspective, Meltwater's suite is a seamless package enabling clients to access various features all from within a single portal.

***Meltwater's Negotiations and Agreement with TVEyes***

26. Upon information and belief, TVEyes was launched in 1999 as a broadcast media search engine and monitoring system.

27. In or about 2013, Meltwater and TVEyes were negotiating the terms of a deal that would enable Meltwater to add TVEyes' broadcast monitoring capabilities to Meltwater's suite of technologies accessible to its clients.

28. On or about November 15, 2013, Meltwater[1] and TVEyes entered into a Broadcast Monitoring Service Agreement (the "Agreement"). A true and correct

[1] The Agreement was entered into between TVEyes and Meltwater News US1, Inc. On or about December 16, 2022, Meltwater News US1, Inc. merged with Meltwater News US, Inc. (the Plaintiff herein). Accordingly, Meltwater is the successor-in-interest to Meltwater News US1, Inc., and has performed under the Agreement, and TVEyes has accepted performance by Meltwater News US1, Inc., during its subsequent renewal terms.

copy[2] of the relevant portions of Agreement is attached hereto as **Exhibit 1**.[3]

29. Following the Agreement, Meltwater and TVEyes entered into a number of additional contracts and amendments containing substantively similar terms governing TVEyes' provision of content in other countries and regions including Germany, Canada, Australia, New Zealand, Ireland, Netherlands, Singapore, Iraq, Jordan, Lebanon, Morrocco, Qatar, Saudi Arabia, United Arab Emirates, Bahrain, Egypt, Oman, Pan Arab, United Kingdom, Russia, Sweden, Japan, St. John's, Spain, Cypress, Greece, Cuba, France, Mexico, Switzerland. True and correct copies of these agreements and amendments are attached hereto as **Exhibit 2.**

30. The Agreement contemplated that TVEyes' Application Programming Interfaces (API) feeds "will integrate with the [Meltwater] product interface so that the look and feel of the broadcast component is consistent with the current [Meltwater] offering." Appendix B, § 2.3.

31. However, it took several years until July 2016 to fully integrate TVEyes' API feeds into the Meltwater platform.

32. Prior to 2016, on a customer-by-customer basis, Meltwater was provisioned with a TVEyes account with a generic single user access per client through which Meltwater account representatives would save searches relevant to each customer and generate an RSS feed which could then plug in to the Meltwater

---

[2] In some instances, Meltwater has redacted certain of the exhibits appended hereto where necessary to preserve the confidentiality of the Parties' pricing information and the terms of their renewal negotiations.

[3] Meltwater's records relating to the Agreement were maintained by its former Global Head of Content and Data Partnership, Daren Benzi. Mr. Benzi left Meltwater in or about October 2018 and subsequently joined TVEyes. Prior to terminating his employment with Meltwater, Mr. Benzi deleted certain of his records, including Meltwater's extant copy of the complete Agreement. Exhibit 1 hereto is a true and correct copy of the Agreement in Meltwater's possession which, to Meltwater's knowledge and belief, constitutes the relevant portions of the Agreement entered into between the Parties. To Meltwater's knowledge, the only portions of the Agreement omitted from Exhibit 1 are Appendices C and D.

platform.

33. TVEyes has provided Meltwater's clients access to its API feeds since July 2016 and Podcast Monitoring service since 2020 through Meltwater's suite. These customers, with the exception of very few, have never been granted access to the TVEyes products except through Meltwater's platform.

34. After 2016, the API feeds were fully integrated into the Meltwater platform, such that, from the customer's perspective, it was a seamless suite of technologies.

35. Currently, and at TVEyes' request, all of the RSS feeds created by Meltwater account representatives for its customers were deleted and access to those TVEyes accounts were revoked.

36. On or about April 27, 2020, Meltwater and TVEyes entered in to an amendment to the Agreement for "Podcasts and Archiving." A true and correct copy of the Amendment is attached hereto as **Exhibit 3**.

37. The Amendment enabled Meltwater to add the TVEyes Podcast Monitoring Service to its offerings "sold to Meltwater end user clients globally" as well as its Archiving Service.

***TVEyes' Obligations to Provide "Access" to Meltwater Customers***

38. "Services" is defined in the Agreement as the "[s]ervices to be delivered by TVE as described in Schedule 2…"

39. Schedule 2 (Services Specification) defines Services as "the TVE functionality…[that] will be provided to Meltwater via two API's."

40. Schedule 1 defines the "Services" that TVEyes is to provide as functionalities provided to Meltwater for the benefit of Meltwater's customers and confirms that Meltwater "will maintain the direct relationship with the customer..."

41. Schedule 1 further notes that "TVEyes will make no charge for the provision of staff training and work necessary to integrate the TVEyes API feed within the Meltwater integrated system."

42. Section 3.2 notes, "[f]or the avoidance of doubt, nothing shall prevent Meltwater providing Content to any customer and TVE acknowledges that Meltwater cannot control the dissemination of such Content within such customer's group or businesses as long as the content is for internal use only by the customer."

***Meltwater's Payment and Quarterly Reporting Obligations***

43. The payment provisions in the Agreement, located within Schedule 1 (Fees), state that base fees will be charged to Meltwater "on a per client basis" and go on to say that "[t]his means a fee for each individual client Meltwater signs up to receive content provided by TVE."

44. In other words, the parties agreed that Meltwater's fee payment obligations were on a per-client basis, not on a per-feed, per seat user, or per-credential basis.

45. Thus, when Meltwater signed a new client and provided access to its platform, it was treated as a single client for fee payment purposes.

46. Schedule 1 to the Agreement further required Meltwater to provide quarterly reports consisting of "a reconciliation of the number of TVE[yes'] sales including the number of units associated with each of the fees detailed above for a given quarter, detailing new versus repeat customers."

47. These quarterly reports, which Meltwater duly provided throughout the life of the Agreement, never included a column for "# of Concurrent Users."

48. Until very recently, TVEyes never requested that Meltwater's quarterly or monthly reports include this information, or otherwise objected to any of the dozens of quarterly reports previously provided by Meltwater.

49. Indeed, after API integration, it would not make sense for TVEyes to request that Meltwater identify concurrent users as there was no action required by TVEyes to make its content accessible to Meltwater customers. Thus, there were no Meltwater customers, concurrent or otherwise, directly accessing TVEyes' platform.

***Termination of the Agreement and TVEyes' Obligation to Provide Continued Access***

50. As set forth in Section 5.2, the Agreement contemplated an initial two-year term that would automatically renew for subsequent one-year terms unless and until one party gave 120 days' written notice of termination.

51. In the event that either party wished to terminate the Agreement under Section 5.2, Section 5.6 of the Agreement ensures that Meltwater's existing clients who access "the TVE Services through the Meltwater Services shall continue to have access to Content through the end of their current subscription and Meltwater shall continue to pay TVE for that access . . . ."

52. Further, "Content" is defined as "voice-to-text transcripts, video and audio recordings and other content produced or recorded by TVE and provided to Meltwater in the course of performing Services". Consistent with other provisions of the Agreement, this indicated that TVEyes' content was to be "provided to Meltwater" and not to Meltwater's clients by other means.

53. This provision was essential in ensuring that Meltwater's clients did not experience any disruption in how they received Meltwater's suite of services, which included TVEyes' services, during the life of their subscriptions.

54. In exchange for TVEyes continuing to provide Meltwater's clients access after termination of the parties' agreement, Meltwater agreed it would continue to "pay TVE for that access." Agreement, Section 5.6.

55. During the parties' course of dealing, Meltwater has invariably pre-paid for its customers' access to TVEyes' content. In other words, TVEyes is already in possession of commensurate fees at the outset of each subscription term and thus, TVEyes has been paid in advance to perform its obligation to continue providing access to Meltwater's customers during the entirety of their subscriptions.

56. TVEyes' insistence that it may now provide its content directly to Meltwater's clients outside of the Meltwater platform is inconsistent with express

provisions of the parties' Agreement. Indeed, Schedule 2 (Services Specification) states that "TVE functionality will be provided to Meltwater via two API's."

57. Further, Schedule 1 defines the "Services" that TVEyes is to provide as functionalities provided to Meltwater for the benefit of Meltwater's customers and confirms that Meltwater "will maintain the direct relationship with the customer..."

58. Accordingly, Schedule 1 confirms that Meltwater would have the direct relationship with its clients while TVEyes would handle only second-level technical issues with the customer.

59. In keeping with these provisions, during the near decade of the Agreement's operation, TVEyes' services were provided to Meltwater's clients exclusively through Meltwater's suite (whether through RSS or API feed). Meltwater's customers, with the exception of very few, have never been granted access to TVEyes' products in the way that TVEyes now proposes, and in a manner other than through Meltwater's platform.

60. Over the 10-year period of the Agreement, Meltwater has made over $50 million in payments to TVEyes for access to be provided to its customers through the Meltwater platform, all of which TVEyes has accepted without hesitation.

***TVEyes' Attempt to Gain Leverage***

61. When discussions regarding the annual Agreement extension with Meltwater began in early 2024, Meltwater sought to renegotiate certain provisions of the Agreement rather than simply renew it for another term.

62. On July 5, 2024, TVEyes provided notice that the Agreement would terminate rather than renew for a successive annual term. The result of TVEyes' termination letter meant that unless the Parties were able to negotiate a new contract, their decades' long relationship would cease. A true and correct copy of TVEyes' July 5, 2024 letter is attached hereto as **Exhibit 4**.

63. On or about August 5, 2024, TVEyes advised Meltwater that it had retained an "outside specialist firm" that had developed a cryptic list of questions

probing Meltwater's contracts and provision of services to its clients. Specifically, TVEyes asked for:

a. a list of "any large customers using TVEyes data through Meltwater that may exceed reported levels";
b. a list of customers using TVEyes data for AI purposes; and
c. "details of any contracts currently in negotiation that include TVEyes data."

64. On or about August 6, 2024, Meltwater responded to TVEyes' questions in good faith, but noted that it is "difficult when we don't know what the alleged dispute is...hopefully you can provide some clarity based upon the feedback below." Meltwater provided the following responses to TVEyes' questions above:

a. "Meltwater sends TVEyes a monthly report of all new or renewing customers in a format that has been consistent" throughout the parties' relationship, and noted that "there are no customers that access TVEyes data outside of the agreed upon" means of access;
b. Meltwater noted the bizarre nature of this request as "there has never been any requirement for any kind of disclsoure around potential customers pre-sale" and asked whether TVEyes had any "particular active convesration [it] believe[d] [wa]s happening [that it]…would like more clarity on"
c. Meltwater confirmed that "none of [TVEyes'] content or data is being used for any of these purposes. We don't use TVEyes data in any fashion that's at odds with our current contract."

65. On or about September 4, 2024, Meltwater received a response directly from Kroll, a financial risk and advisory firm that TVEyes had previously alluded to, asking several direct follow-up questions indicating that it was skeptical of Meltwater's denial of having breached the Agreement in the manner suggested by TVEyes' questions. For example, Kroll asked whether Meltwater's use of the phrase

"none of [TVEyes'] content or data *is being used* for any of these purposes" meant that it had been used for improper purposes previously.

66. On or about September 10, 2024, Meltwater responded to Kroll confirming that "we only make TVEyes content available in a specified manner and include contractual restrictions in our customer agreements to protect the rights to content made available in our platform. We take all practical and feasible measures to enforce our terms with our customers and ensure compliance with our content agreements. A true and correct copy of this email exchange is attached hereto as **Exhibit 5**.

67. TVEyes also raised allegations of underpayment premised upon a 'concurrent user' theory that it had never once noted previously. On or about September 13, 2024, TVEyes, through its counsel, sent a letter to Meltwater claiming that Meltwater had breached Schedule 1 of the Agreement by failing to report "additional concurrent users" in its quarterly reports. A true and correct copy of the September 13, 2024 letter is attached hereto as **Exhibit 6**.

68. This letter made clear that TVEyes' prior demands that Meltwater provide detailed information about its clients appears to have been an attempt to gather data for its purported claim in that dispute that Meltwater must pay for "concurrent users."

69. On September 18, 2024, Meltwater, through the undersigned counsel, sent a response letter rejecting TVEyes' purported revisionist interpretation as antithetical to the parties' actual contractual intent and their 10-year course of dealing. A true and correct copy of the September 18, 2024 letter is attached hereto as **Exhibit 7**.

70. In addition to its attempts to manufacture a non-existent breach of the Agreement, TVEyes took several unreasonable positions during negotiations for the new contract that Meltwater promptly rejected.

71. On October 16, 2024, Mr. Benzi sent Meltwater another set of renewal terms that were on their face objectionable to Meltwater, not consistent with the operative Agreement or anywhere close, and not ordinary commercial terms for this type of Agreement.

72. Just 25 minutes later, Dave Seltzer, TVEyes' Chief Technology Officer, sent Meltwater's technical team an email indicating that the impending termination would affect various APIs on November 15, 2024. A true and correct copy of Mr. Seltzer's October 16, 2024 email is attached hereto as **Exhibit 8.**

73. On October 18, 2024, Johnny Vance (Meltwater's Vice President of Partnerships and Business Development) wrote an email to Daren Benzi (TVEyes' Chief Commercial Officer), asking whether TVEyes intended to cut off services everywhere through the API's provided to Meltwater.

74. On or about October 23, 2024, Mr. Benzi responded by email, confirming that beginning on November 15, 2024, "TVEyes will no longer provide Meltwater direct API access, however, consistent with our Agreement, existing Meltwater clients will be able to receive TVEyes content directly from TVEyes by accessing it through the TVEyes platform through the end of their current subscription." A true and correct copy of Mr. Benzi's October 23, 2024 email is attached hereto as **Exhibit 9**.

75. On November 1, 2024, Mr. Benzi further confirmed that TVEyes intended to remove access to its Podcast Monitoring service from the Meltwater suite effective November 15, 2024 as well. A true and correct copy of Mr. Benzi's November 1, 2024 email is attached hereto as **Exhibit 10**.

76. On or about November 4, 2024, Mr. Benzi sent Mr. Vance another email, stating that in the event the parties were unable to extend the Agreement, "TVEyes will no longer provide Meltwater with direct API access after the end of the existing cont[r]act." A true and correct copy of Mr. Benzi's November 4, 2024 email is attached hereto as **Exhibit 11**.

77. Additionally, upon information and belief, TVEyes is not actually capable of onboarding Meltwater's thousands of customers onto their platform prior to November 15, 2024.

78. Upon information and belief, TVEyes currently only has approximately 3,000 customers directly accessing their platform, such that adding Meltwater's customers would more than double the number of users accessing the TVEyes platform.

79. Thus not only is TVEyes' threatened action contrary to the Parties' Agreement and course of dealing, it is also practically impossible and thus further evidence of its bad faith.

***TVEyes' Threatened Disruption to Meltwater and Third Parties' Business***

80. In the event that TVEyes does, in fact, shut off access to its API feeds and Podcast Monitoring service to Meltwater's customers through the Meltwater suite, it would cause irreparable harm to Meltwater's business operations.

81. As a result of TVEyes' forthcoming rescission of access across the globe, Meltwater will now be forced to onboard content from a new service provider for thousands of clients in less than 30 days. Onboarding content from a new service provider also imposes a significant and additional burden upon Meltwater's R&D team who is tasked with building the integration for APIs from a new service provider. This, in turn, causes Meltwater's R&D team to shift focus from what it would otherwise be doing as part of its day-to-day responsibilities. Additionally, there is a burden on Meltwater's sales and support team who will have to assist thousands of customers to transition to a separate platform.

82. The replacement of TVEyes' content with comparable third-party content therefore creates a significant expense for Meltwater. In addition, because Meltwater has already pre-paid TVEyes for this content for its clients, it is essentially double-paying for this content all while enduring significant disruption to its business operations, and those of its clients.

83. Moreover, replacing TVEyes' content with comparable third-party content is a time-intensive and substantial process, particularly when repeated thousands of times for each of the Meltwater clients, whose contracts with Meltwater represent millions in revenue to Meltwater.

84. This extremely truncated timeline has also forced Meltwater to incur fees and expenses that it would not otherwise have had to, including fee payments to a replacement third-party provider to ensure that all of its clients will be able to access comparable replacement content as of November 15, 2024.

85. TVEyes' proposed manner of providing access increases the burdensome nature of this wind-down process, as the Agreement contemplated a gradual, phased replacement. Specifically, Section 5.6 affords Meltwater to provide continuity of services for existing customers with a minimal amount of disruption which would allow them to continue with their own day-to-day activities throughout the expiration of each client's respective subscription term.

86. Separate and apart from these monetary damages, Meltwater's business reputation and goodwill will be irreparably harmed by the apparent removal of broadcast and podcast sources, two of its Media Monitoring features while its clients' contracts are still active.

87. Removing these sources from Meltwater's suite would disrupt Meltwater's customers who have purchased and pre-paid for access to TVEyes' content and potentially expose Meltwater to liability for no longer providing its clients with promised services.

88. In turn, Meltwater's clients will suffer disruption if they have to access TVEyes' content outside the Meltwater platform as it would necessitate training in a compressed time frame. Additionally, Meltwater's customers will suffer disruption in their processes and workflows. Indeed, there are no contracts between TVEyes and Meltwater's clients and therefore no operative agreements governing the direct access TVEyes intends to provide.

89. Removal of TVEyes' content from Meltwater's suite would further deprive clients of Meltwater's comprehensive suite of analytics, dashboard and advanced capabilities across online news, social media, print, broadcast, and podcasts, which is beyond the capabilities of TVEyes' decade-old Media Monitoring Service product. Indeed, there is an interplay between TVEyes' service and Meltwater's larger suite of services, which permits its customers to view in one place (Meltwater's platform) all of the aggregated data across multiple media sources it requires. Accordingly, TVEyes' intended change in how Meltwater's customers access its content would cause a loss to Meltwater's clients beyond the disruption associated with their having to separately access TVEyes' content outside the Meltwater platform. Giving Meltwater's customers access to TVEyes' content outside the Meltwater platform is not comparable to accessing such content in the Meltwater platform. The TVEyes platform is an inferior product and value to Meltwater's client.

90. On or about November 6, 2024, Meltwater, through the undersigned counsel, sent TVEyes a letter notifying TVEyes that its interpretation was inconsistent with TVEyes' obligations under the Agreement and with the parties' longstanding relationship, and that it was treating TVEyes' position as an anticipatory repudiation of the Agreement. A true and correct copy of Meltwater's November 6, 2024 letter is attached hereto as **Exhibit 12.**

91. On or about November 6, 2024, Meltwater tendered payments to TVEyes pursuant to Section 4 and Schedule 1 of the Agreement, encompassing all fees due and payable to TVEyes to date.

92. Meltwater's November 6, 2024 payment was tendered on the condition that, consistent with the parties' Agreement, TVEyes would not interfere with, terminate, or otherwise disrupt the TVEyes' services that Meltwater's clients' currently have access to via Meltwater's direct API access.

93. On or about November 7, 2024, TVEyes, through its counsel, sent a letter to Meltwater's counsel asserting that TVEyes' position is "entirely consistent" with

its obligations under Section 5.6 of the Agreement and rejecting the conditions upon which Meltwater tendered payment. TVEyes further sought to invoke the Agreement's informal dispute resolution procedure under Section 9.3. A true and correct copy of TVEyes' November 7, 2024 letter is attached hereto as **Exhibit 13**.

94. On or about November 7, 2024, Meltwater, through its counsel, sent a letter to TVEyes' counsel explaining that its attempt to invoke Section 9.3 was moot because: (1) this dispute is part of the overall dispute that the parties had been discussing since TVEyes' September 13, 2024 letter and for which TVEyes has previously stated the parties exhausted the informal dispute resolution procedure; and (2) that TVEyes' recent confirmation that it plans to shutoff existing contractually required access on November 15, 2024, does not allow sufficient time to employ the informal dispute resolution procedures before then.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
### Against Defendants

95. Meltwater incorporates and realleges the allegations in Paragraphs 1 through 95, inclusive, as though fully set forth herein.

96. The Agreement constitutes a valid and enforceable contract.

97. Meltwater has performed all terms, conditions and covenants required on its part to be performed in accordance with the Agreement, except those terms, conditions, and covenants, if any, that TVEyes has waived or that Meltwater is excused or prevented from performing by virtue of TVEyes' material breaches of the Agreement or other acts and omissions.

98. TVEyes has anticipatorily breached the Agreement. The Agreement provides, *inter alia,* that in the event either party wishes to terminate the Agreement under Section 5.2, TVEyes shall continue to provide access to its API feeds and Podcast Monitoring service through the Meltwater suite to Meltwater's clients through the end of their current subscription.

99. Despite seeking to terminate the Agreement under Section 5.2, TVEyes gave notice to Meltwater that it would not comply with the terms of the Agreement and thus repudiated it, by confirming that it does not intend to maintain access to its API feeds or Podcast Monitoring service for Meltwater's clients through the Meltwater suite.

100. As the Agreement is set to terminate on November 15, 2024, TVEyes' position is inconsistent with its ability, and indeed TVEyes has outright refused, to comply with its obligations thereunder.

101. Meltwater has provided notice to TVEyes that it is treating TVEyes' position as an anticipatory breach of the Agreement, to which TVEyes has not retracted its repudiation.

102. At the time Meltwater received TVEyes' repudiation, it had otherwise complied with its obligations and fully performed under the Agreement and remains ready, willing, and able to complete performance under the Agreement.

103. As a direct and proximate cause of TVEyes' anticipatory repudiation of the Agreement, Meltwater is entitled to injunctive relief preventing TVEyes from causing irreparable harm to its business operations, reputation, and goodwill.

104. As a direct and proximate result of TVEyes' anticipatory breach, Meltwater has suffered general, consequential, and incidental damages in an amount to be proven at trial

105. Moreover, in the event that TVEyes does make good on its repudiation and revoke access to its content on November 15, 2024, Meltwater is entitled to reimbursement of the portion of its November 6, 2024 payment to TVEyes encompassing the wind-down period.

## SECOND CLAIM FOR RELIEF

**Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendants**

106. Meltwater incorporates and realleges the allegations in Paragraphs 1 through 105, inclusive, as though fully set forth herein.

107. Meltwater and TVEyes entered into a binding and enforceable Agreement.

108. Like all contracts, the Agreement contains an implied covenant that neither party will take any action, or refuse to take any action, which would deny the other party the intended object of the agreement.

109. Meltwater has performed all terms, conditions and covenants required on its part to be performed in accordance with the Agreement, except those terms, conditions, and covenants, if any, that TVEyes has waived or that Meltwater is excused or prevented from performing by virtue of TVEyes' material breaches of the Agreement or other acts and omissions.

110. TVEyes has violated the implied covenant in multiple ways including, *inter alia*, taking unreasonable bargaining positions during the renewal negotiations, demanding additional payments for concurrent users, and stating that it will remove access to its API feeds and Podcast Monitoring service on the Meltwater suite.

111. To the extent the breaches alleged above do not constitute breaches of the express terms of the Agreement, they are breaches of the implied covenant of good faith and fair dealing. In addition, TVEyes has breached the implied covenant of good faith and fair dealing by threatening to take actions that will harm Meltwater's business and reputation.

112. As a direct and proximate result of TVEyes' multiple breaches of the implied covenant of good faith and fair dealing, Meltwater has been damaged in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
**Declaratory Relief**
**Against Defendants**

113. Meltwater incorporates and realleges the allegations in Paragraphs 1 through 112, inclusive, as though fully set forth herein.

114. Meltwater has performed all terms, conditions and covenants required on its part to be performed in accordance with the Agreement, except those terms, conditions, and covenants, if any, that TVEyes has waived or that Meltwater is excused or prevented from performing by virtue of TVEyes' material breaches of the Agreement or other acts and omissions.

115. An actual controversy exists between Meltwater and TVEyes relating to the respective rights and obligations relative to the Agreement and whether Meltwater's fee payment obligations are calculated on a per-client or per-user basis. Meltwater asks for a judicial declaration establishing its rights under the Agreement.

116. To resolve this dispute, Meltwater requests that the Court declare the rights and obligations of Meltwater and TVEyes with respect to the Agreement.

117. Specifically, Meltwater seeks a declaratory judgment determining, but not limited to, the following:

a. Meltwater has complied with its obligations under, and is not in breach of, the Agreement.
b. Meltwater's obligations as it relates to payment for "concurrent users."
c. Meltwater has no obligation to pay TVEyes any additional amounts for "concurrent users."

118. Meltwater is also entitled to further relief based on a declaratory judgment or decree that is necessary or proper to enforce the Court's determination of the parties' rights.

## PRAYER FOR RELIEF

WHEREFORE, Meltwater respectfully requests that this Court grant relief in its favor and against Defendants as follows:

a. For an Order declaring that Defendants breached the Agreement;

b. For compensatory damages in an amount to be determined at trial but no less than the diversity jurisdictional minimum of $75,000;

c. For specific performance;

d. For pre-judgment and post-judgment interest;

e. For general, special, and exemplary damages, according to proof;

f. For interest on any monetary award to Meltwater at the maximum legal rate;

g. For a temporary restraining order and preliminary injunction enjoining Defendants from terminating or otherwise altering the current method of access to its API feeds and Podcast Monitoring service for Meltwater's customers throughout their current subscription terms;

h. For all costs and fees incurred as a result of bringing this lawsuit;

i. For any other orders necessary to accomplish complete justice between the parties; and

j. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Meltwater hereby demands a trial by jury as to all issues so triable.

///

///

///

///

///

///

Dated: November 8, 2024

By: /s/ John Samuel Gibson

John Samuel Gibson
Tanya L. Greene
Erin T. Huntington
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: 310.595.3000
Fax: 310.595.3300

Attorneys for Plaintiff Meltwater News US Inc.

**VERIFICATION**

STATE OF GEORGIA )
)
COUNTY OF FULTON )

I, Johnny Vance, declare:

I am the Vice President of Partnerships and Business Development for Plaintiff Meltwater News US, Inc., the Plaintiff in this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing Verified Complaint and except for those facts alleged upon information and belief, believe them to be true of my own personal knowledge. As to those facts stated on information and belief, I am informed and believe those matters to be true and on that ground I allege that the facts stated therein are true.

I declare under penalty of perjury that the above is true and correct.

Executed this 8th day of November, 2024, at Atlanta, Georgia.

Johnny Vance